UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

WILSON MAYO,

               Plaintiff,

    v.

SGT. J. LAVIS, J. COLLIER, S. KELLY, and
BOUGHKITE,

               Defendants.

**DECISION AND ORDER**
11-CV-869S

## I. INTRODUCTION

In this action, pro se plaintiff Wilson Mayo alleges, pursuant to 42 U.S.C. § 1983, that (1) Defendant Kelly violated his Eighth Amendment rights by using excessive force against him, (2) Defendant Collier violated his Fourteenth Amendment rights by failing to assist him during a disciplinary hearing, and (3) Defendant Lavis violated his Fourteenth Amendment rights by improperly conducting his disciplinary hearing.

Presently before this Court is Defendants' Motion for Summary Judgment, which Mayo opposes. (Docket Nos. 42, 48–50.) For the following reasons, Defendants' motion is granted in its entirety.

## II. BACKGROUND

At all times relevant, Mayo was an inmate in the care and custody of the New York Department of Corrections and Community Services ("DOCCS") at the Attica Correctional Facility ("Attica").[1] (Defendants' Statement of Undisputed Facts ("Defendants' Statement"), Docket No. 42-2, ¶ 2; Plaintiff's Statement of Disputed Factual Issues ("Plaintiff's

---

[1]Mayo is now at the Cape Vincent Correctional Facility.

1

Statement"), Docket No. 48, ¶ 1.[2])  Defendants were all correction officers employed by DOCCS and assigned to Attica.  (Defendants' Statement, ¶¶ 3–6; Plaintiff's Statement, ¶ 1.)  Lavis was a Lieutenant.  (Defendants' Statement, ¶ 6; Plaintiff's Statement, ¶ 1.)

## A.    The Visiting Area Incident

On the morning of February 12, 2009, prison officials informed Mayo that he had a visitor.  (Defendants' Statement, ¶ 7; Plaintiff's Statement, ¶ 1.)  Mayo proceeded to one of the visitation rooms, where he visited for approximately an hour and a half, from 10:00 a.m. to approximately 11:30 a.m.  (Defendants' Statement, ¶ 7; Plaintiff's Statement, ¶ 1.)

After the visit, Kelly processed Mayo out of the visitation area for return to his cell. (Defendants' Statement, ¶ 8; Plaintiff's Statement, ¶ 1.)  As part of this procedure, Kelly frisked Mayo.  (Defendants' Statement, ¶ 9; Plaintiff's Statement, ¶ 2.)  After he did so, he told Mayo that he could retrieve his belt and glasses "up front in property," effectively confiscating them at that time.  (Defendants' Statement, ¶ 11; Plaintiff's Statement, ¶ 3.)

Mayo protested the confiscation of his belongings and asked to speak to a Sergeant.  (Defendants' Statement, ¶ 12; Plaintiff's Statement, ¶ 1.)  In response, Kelly allegedly told Mayo to "shut his black mouth" and pushed him onto a bench next to the officers' desk.  (Defendants' Statement, ¶ 12; Plaintiff's Statement, ¶ 1.)  When Mayo tried to get up from the bench, Kelly allegedly punched him in the face, grabbed him with both hands, and threw him onto the floor, where Mayo landed on his back.  (Defendants' Statement, ¶ 13; Plaintiff's Statement, ¶ 4.)  Kelly denies these allegations.

---

[2]The parties' Rule 56 Statements contain citations to the record evidence.  This Court has confirmed and is satisfied that the evidence cited generally supports the assertions therein.  Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) (holding that factual allegations contained in a Rule 56 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

Kelly then held Mayo on the ground until other officers arrived, at which point Mayo was handcuffed and taken to the prison hospital unit, where he was found to have two abrasions but no other physical injuries or physical pain.  (Defendants' Statement, ¶¶ 14–18, 20; Plaintiff's Statement, ¶¶ 5-6, 8.)  Mayo maintains, however, that he suffered psychological injuries stemming from the incident as well, mostly due to being placed on contraband watch in the Special Watch Unit.  (Defendants' Statement, ¶¶ 25–27; Plaintiff's Statement, ¶¶ 6, 11.)  After three days in the Special Watch Unit, where no contraband was discovered, Mayo was moved to the Special Housing Unit.  (Defendants' Statement, ¶ 28; Plaintiff's Statement, ¶¶ 6, 13.)

## B.    Misbehavior Report

Following this incident, Kelly filed a Misbehavior Report against Mayo, alleging that after the frisk, Mayo attempted to grab Kelly's baton and struck Kelly in the face with a closed fist.  (Defendants' Statement, ¶ 21; Plaintiff's Statement, ¶¶ 5-6.)  Mayo denies these allegations.  (Plaintiff's Statement, ¶ 9.)  Nonetheless, Mayo was charged with "assault on staff" and "violent conduct," which became the subject of a Tier III hearing against Mayo.  (Defendants' Statement, ¶¶ 22, 23; Plaintiff's Statement, ¶ 10.)

Mayo was provided a copy of the Misbehavior Report while he was in the Special Housing Unit and was served with it again three days before the Tier III hearing.  (Defendants' Statement, ¶¶ 29, 30; Plaintiff's Statement, ¶ 13.)  At that time, Mayo was also given the opportunity to select three individuals to possibly serve as his staff hearing assistant.  (Defendants' Statement, ¶ 31; Plaintiff's Statement, ¶ 14.)  Collier, one of the three individuals Mayo selected, was assigned to assist Mayo.  (Defendants' Statement, ¶ 31; Plaintiff's Statement, ¶ 14.)

Mayo met with Collier before the Tier III hearing and asked him to locate his confiscated property, identify the visiting room officers so that he could call them as witnesses, and obtain copies of his D-block pass, medical reports, and drug test results. (Defendants' Statement, ¶¶ 33, 34; Plaintiff's Statement, ¶ 15.)  Collier assisted Mayo as requested and both completed a form documenting Collier's assistance.  (Defendants' Statement, ¶¶ 35, 36; Plaintiff's Statement, ¶¶ 16–16b, 17, 17a.)

## C.    Tier III Hearing

Mayo's Tier III hearing began on February 21, 2009.  (Defendants' Statement, ¶ 37; Plaintiff's Statement, ¶ 18.)  Lavis acted as the Hearing Officer.  (Defendants' Statement, ¶ 38; Plaintiff's Statement, ¶ 18.)  At the beginning of the hearing, Lavis explained to Mayo that the proceeding would be recorded, that he could call witnesses, and that statements he made during the proceeding could not be used against him in a criminal proceeding. (Defendants' Statement, ¶ 40; Plaintiff's Statement, ¶ 18.)  Lavis also advised Mayo that he could submit testimony and documentary evidence and that he could lodge objections. (Defendants' Statement, ¶ 37; Plaintiff's Statement, ¶ 18.)   Lavis confirmed that Mayo understood these rights.  (Defendants' Statement, ¶ 41; Plaintiff's Statement, ¶ 18.)

Mayo advised Lavis that he wished to call Kelly, the two visiting room officers (identified as Burgio and Pilarsky), and the officer responsible for pre-visitation frisks, as witnesses.  (Defendants' Statement, ¶ 45; Plaintiff's Statement, ¶ 21.)  Mayo also advised Lavis that he wished to rely on the documents he had requested Collier obtain on his behalf.  (Defendants' Statement, ¶ 46; Plaintiff's Statement, ¶ 22.)  Lavis told Mayo that his medical records may not be relevant, that his drug tests were negative, and that he had denied Collier's request to get a copy of Mayo's D-block pass because it was irrelevant to

4

the proceedings.  (Defendants' Statement, ¶¶ 47–50; Plaintiff's Statement, ¶ 22.)

As a further preliminary matter, Lavis read the charges against Mayo and allowed Mayo to enter "not guilty" pleas to each charge.  (Defendants' Statement, ¶¶ 51, 52; Plaintiff's Statement, ¶ 22.)  Lavis also permitted Mayo to state his case and explain his defense.  (Defendants' Statement, ¶ 53; Plaintiff's Statement, ¶ 22.)

Lavis then adjourned the Tier III hearing so that he could identify and locate the officer responsible for pre-visitation screening, which happened to be Boughkite. (Defendants' Statement, ¶¶ 76, 77; Plaintiff's Statement, ¶ 37.)

The hearing resumed again on February 27, 2009, with Lavis permitting Mayo to begin calling witnesses.  (Defendants' Statement, ¶¶ 54, 57; Plaintiff's Statement, ¶ 24.) Following standard procedure, Mayo was required to ask questions of his witnesses through Lavis, who would determine whether the witness should answer.  (Defendants' Statement, ¶¶ 55, 56; Plaintiff's Statement, ¶ 24.)

Mayo called Kelly as his first witness.  (Defendants' Statement, ¶ 57; Plaintiff's Statement, ¶ 24.) Mayo was present during Kelly's testimony and was permitted to ask him questions through Lavis.  (Defendants' Statement, ¶¶ 57, 58; Plaintiff's Statement, ¶ 24.) Kelly testified that after he frisked Mayo as part of processing him out of the visitation area, he asked Mayo for his identification card, at which time Mayo grabbed for Kelly's baton. (Defendants' Statement, ¶ 61.) Kelly further testified that when he rotated away from Mayo to prevent him from taking his baton, Mayo struck him in the face with a closed fist. (Defendants' Statement, ¶ 61.)   This testimony was consistent with the Misbehavior Report.  (Defendants' Statement, ¶ 62.)

At the conclusion of Kelly's testimony, Lavis permitted Mayo to comment on the

testimony and to discuss it with him.  (Defendants' Statement, ¶ 65; Plaintiff's Statement, ¶ 30.)  Plaintiff denied Kelly's account of the incident and maintained that Kelly testified falsely.  (Defendants' Statement, ¶ 66; Plaintiff's Statement, ¶¶ 25–30.)

Lavis denied Mayo's request to ask Kelly certain questions on the basis that the proffered questions were asked and answered, were irrelevant, or would impermissibly elicit facility procedures.  (Defendants' Statement, ¶¶ 59, 60; Plaintiff's Statement, ¶ 24.) Lavis excluded other evidence on the same basis, including the pre-visitation property log and testimony from the visiting room officers (Burgio and Pilarsky).  (Defendants' Statement, ¶¶ 68–74.)  Mayo's objections to Lavis's rulings were noted on the record and Mayo was permitted to explain his objections.  (Defendants' Statement, ¶¶ 74, 75; Plaintiff's Statement, ¶¶ 36, 37.)

Mayo next called Boughkite to testify.  (Defendants' Statement, ¶ 78, Plaintiff's Statement, ¶ 39.)  Plaintiff was present for Boughkite's testimony and was permitted to question him through Lavis.  (Defendants' Statement, ¶¶ 79–80; Plaintiff's Statement, ¶ 39.) Boughkite testified that he observed the incident between Kelly and Mayo and observed Mayo reach for Kelly's baton and then hit Kelly in the face.  (Defendants' Statement, ¶¶ 81, 82; Plaintiff's Statement, ¶ 18.)

Mayo objected to Boughkite's testimony and his objections were noted on the record.  (Defendants' Statement, ¶ 84; Plaintiff's Statement, ¶ 41.)  At the conclusion of Boughkite's testimony, Lavis permitted Mayo to comment on the testimony and to discuss it with him.  (Defendants' Statement, ¶ 86; Plaintiff's Statement, ¶ 41.)  Mayo continues to dispute that Boughtkite was the pre-visitation screening officer and questions the veracity of his testimony.  (Defendants' Statement, ¶ 87; Plaintiff's Statement, ¶¶ 38, 40, 41.)

There is no dispute that Lavis answered all of Mayo's questions during the hearing; that he allowed Mayo to state his objections on the record; and that he explained the basis of his various rulings and conclusions. (Defendants' Statement, ¶¶ 60, 69, 71–73, 88, 89; Plaintiff's Statement, ¶ 41.)

At the end of the hearing, Lavis found Mayo guilty of all charges. (Defendants' Statement, ¶¶ 90, 93; Plaintiff's Statement, ¶ 41.) Lavis explained the reasons for his decision to Mayo and also provided him with a written explanation of the basis of his decision in the form of a "Hearing Disposition" form. (Defendants' Statement, ¶¶ 91, 92; Plaintiff's Statement, ¶ 41.) As punishment, Lavis sentenced Mayo to six months confinement in the Special Housing Unit, six months loss of phone privileges, and he recommended loss of four months good time. (Defendants' Statement, ¶¶ 94, 95; Plaintiff's Statement, ¶ 41.)

Mayo appealed to the Commissioner of DOCCS, who denied his appeal. (Defendants' Statement, ¶¶ 97, 98; Plaintiff's Statement, ¶ 41.) Mayo was then transported to Lakeview Correctional Facility to serve his Special Housing Unit punishment. (Defendants' Statement, ¶ 99[3]; Plaintiff's Statement, ¶ 41.) While there, Mayo appealed to the Superintendent of Lakeview for "discretionary review" and received a two-month reduction in his Special Housing Unit punishment. (Defendants' Statement, ¶ 99; Plaintiff's Statement, ¶ 41.) Mayo also unsuccessfully challenged the results of his hearing in an Article 78 proceeding in state court. (Defendants' Statement, ¶ 99; Plaintiff's Statement, ¶ 41.) Mayo did not, however, file any internal prison grievances against Kelly for his

---

[3]Defendants' Statement erroneously contains two paragraphs numbered 98, the second of which this Court cites herein as 99.

alleged use of force.  (Defendants' Statement, ¶ 99; Plaintiff's Statement, ¶ 41.)

## III. DISCUSSION

Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally and interpret them to raise the strongest arguments that they suggest.  See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  Since Mayo is proceeding pro se, this Court has considered his submissions and arguments accordingly.

Mayo has three surviving causes of action.  First, he claims that Kelly used excessive force against him in violation of the Eighth Amendment during the visitation area incident.  Second, he claims that Collier violated his Fourteenth Amendment Due Process rights by failing to effectively assist him in his disciplinary hearing.  Finally, he claims that Lavis further violated his Fourteenth Amendment Due Process rights by conducting an improper disciplinary hearing.  Defendants seek summary judgment on each claim.

## A.    Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn

8

from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the nonmoving party.  Anderson, 477 U.S. at 252.

**B.**    **42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983.  On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution.  See Graham v. Connor, 490 U.S. 386,

393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting <u>Baker v. McCollan</u>, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)).   Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged.   See <u>Baker</u>, 443 U.S. at 140.   Here, Mayo's claims are grounded in the Eighth and Fourteenth Amendments.

## C.    Personal Involvement

Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983.   <u>See</u> <u>Haygood v. City of New York</u>, 64 F.Supp. 2d 275, 280 (S.D.N.Y. 1999).   Moreover, it is well settled in this Circuit that personal involvement by defendants in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.   <u>See</u> <u>McKinnon v. Patterson</u>, 568 F.2d 930, 934 (2d Cir. 1977); <u>Richardson v. Coughlin</u>, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); <u>Pritchett v. Artuz</u>, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996); <u>see also</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994).

Here, Mayo has not asserted any claims against Boughkite, nor has he alleged that Boughkite was personally involved in any of the constitutional violations he alleges.   In fact, Mayo specifically disclaims that Boughkite was even present during the events in question. (Plaintiff's Statement, ¶¶ 38, 40).   Any claims against Boughkite are therefore dismissed

10

on the basis that Mayo has failed to establish his personal involvement in any constitutional violation.

## D.    Eighth Amendment Claim

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 11 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); U.S. Const. amend. VIII.   "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." Helling v. McKinney, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quotation and citation omitted).   Part of the state's duty is to protect inmates from punishments that are "totally without penological justification."   See Williams v. Fitzpatrick, No. 03 CV 11, 2006 WL 1889964, at *2 (D.Vt. July 10, 2006) (quoting Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

To succeed on an Eighth Amendment excessive force claim, a plaintiff must establish two components: "(1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated 'contemporary standards of decency.'" Flynn v. Ward, 9:15-CV-1028, 2016 WL 1357737, at *8 (N.D.N.Y. Apr. 5, 2016) (quoting Blyden v. Mancusi, 186 F.3d 252, 262-63 (2d Cir. 1999)).

To meet the subjective prong, "the inmate must show that the prison officials involved 'had a wanton state of mind when they engaged in the misconduct.'" See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (quoting Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994)).   For excessive force claims under the Eighth Amendment, the test for wantonness "is whether the force was used in a good-faith effort to maintain or restore

11

discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003).  Factors to be considered are "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."  Id. (citation omitted).

To meet the objective prong, the alleged violation must be sufficiently serious by objective standards, those being contemporary standards of decency.  Farmer, 511 U.S. at 834; Blyden, 186 F.3d at 263.  Although the "de minimis use of force will rarely suffice to state a constitutional claim," Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993), "the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance 'contemporary standards of decency are always violated,'" Ward, 2016 WL 1357737, at *8 (quoting Blyden, 186 F.3d at 263).

The Second Circuit has explained an excessive force claim as follows:

> The malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident.  This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. Nevertheless, a de minimis use of force will rarely suffice to state a constitutional claim.  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.

Griffin, 193 F.3d at 91 (citations and internal quotations omitted).

Thus, the objective prong may be satisfied without a showing of a serious or significant injury, as long as the amount of force used is not de minimis.  See United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999).  At bottom, the key inquiry is "whether force was

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (2009)(citation omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (per curiam) (describing this inquiry as "the core judicial inquiry").  In other words, the key consideration is the nature of the force rather than the extent of the injury.  See Wilkins, 559 U.S. at 34.

Mayo alleges that Kelly used excessive force against him in violation of his Eighth Amendment rights when he pushed him onto the bench, punched him in the face, and then threw him onto the floor.  Mayo admits, however, that he never filed a grievance against Kelly regarding his alleged use of excessive force.  (Defendants' Statement, ¶ 99; Plaintiff's Statement, ¶ 41; Amended Complaint, p. 31.)  This claim must therefore first be dismissed for Mayo's failure to exhaust his administrative remedies.  See Weidman v. Wilcox, No. 6:12-CV-6524 (MAT), 2014 WL 1056416, at *2 (W.D.N.Y. Mar. 17, 2014) ("Prisoners in DOCCS custody must complete a three-step inmate grievance procedure, including two levels of appeals, to exhaust their administrative remedies."); Goodwin v. Burge, No. 08-CV-660A, 2011 WL 2117595, at *10 (W.D.N.Y. Mar. 7, 2011) (noting that administrative remedies must be exhausted before bringing an action under 42 U.S.C. § 1983); 42 U.S.C. § 1997e(a).

But even if Mayo properly exhausted his administrative remedies, his Eighth Amendment claim would fail because even assuming that Kelly pushed Mayo onto the bench, punched him in the face, and threw him on the floor, the force used was de minimis under the caselaw.  See Sprau v. Coughlin, 997 F. Supp. 390, 395 (W.D.N.Y. 1998) (finding that hitting of inmate across neck, face, and eye constituted de minimis use of

force); <u>Brown v. Busch</u>, 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (finding that pushing, shoving, and striking of inmate was *de minimis* use of force); <u>DeArmas v. Jaycox</u>, No. 92 Civ. 6139(LMM), 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993) (finding that inmate who was punched once and kicked once failed to allege more than a non-actionable *de minimus* use of force).  Mayo suffered no injury, no pain, and he did not grieve the incident. Thus, even assuming that Kelly shoved and punched Mayo as alleged, no reasonable jury could find Kelly's conduct "repugnant to the conscience of mankind" or that he acted maliciously and sadistically with the intent to cause Mayo harm.  <u>See</u> <u>Hudson</u>, 503 U.S. at 10.

For these reasons, Kelly is entitled to summary judgment on this claim.

**E.    Fourteenth Amendment Claims**

In <u>Wolff v. McDonnell</u>, the Supreme Court held that whenever an inmate is subjected to a prison disciplinary proceeding that might result in the deprivation of a liberty interest, prison officials must ensure that certain procedural safeguards are in place.  418 U.S. 539, 563-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).  These safeguards include the following protections: "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken."  <u>Smith v. Fischer</u>, 803 F.3d 124, 127 (2d Cir. 2015) (per curiam) (quoting <u>Luna v. Pico</u>, 356 F.3d 481, 487 (2d Cir. 2004)); <u>see also</u> <u>Wolff</u>, 418 U.S. at 563-71.  "Judicial review of the written findings required by due process is limited to determining whether the disposition is supported by 'some evidence.'" <u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004)

(citing Superintendent v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). This standard is met if there is some "reliable evidence" in the record. Luna, 356 F.3d at 487.

Prison authorities also "have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges," especially when he is disabled in some way, such as being confined in the Special Housing Unit. Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988). In New York, prisoners are entitled to an employee assistant to help prepare for a disciplinary proceeding by regulation. See 7 N.Y.C.R.R. §§ 251-4.1, 251-4.2. This assistance must be provided "in good faith and in the best interests of the inmate." Eng, 858 F.2d at 898. "The assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions." Moore v. Peters, 92 F. Supp. 3d 109, 126 (W.D.N.Y. 2015)(citation omitted). Alleged violations of this qualified right are reviewed for harmless error. See Pilgrim v. Luther, 571 F.3d 201, 2016 (2d Cir. 2009).

At the outset, this Court notes that Mayo's claims against Collier and Lavis must be dismissed as barred by the doctrine of issue preclusion, because the New York Supreme Court, Appellate Division, Third Department already resolved the issues Mayo raises. See Mayo v. Fischer, 82 A.D.3d 1421, 918 N.Y.S.2d 676 (3d Dep't 2011). That court rejected Mayo's contention that he was improperly prevented from calling witnesses, that he was prejudiced by inadequate employee assistance, and that Lavis was a biased hearing officer. Id. at 1422. These findings undercut Mayo's Fourteenth Amendment claims. Nonetheless, this Court turns to the merits.

### 1.      Claim Against Collier

Mayo claims that Collier violated his Fourteenth Amendment rights by failing to provide him adequate assistance in advance of his hearing.   In particular, Mayo asserts that Collier failed to obtain all of the documents that he requested, failed to secure his witnesses, and provided false or misleading information about a discussion he had with Kelly concerning Mayo's property.

As noted above, Mayo met with Collier before the Tier III hearing and asked him to locate his confiscated property, identify the visiting room officers so that he could call them as witnesses, and obtain copies of his D-block pass, medical reports, and drug test results. (Defendants' Statement, ¶¶ 33, 34; Plaintiff's Statement, ¶ 15.)  Collier assisted Mayo as requested and both completed a form documenting Collier's assistance.   (Defendants' Statement, ¶¶ 35, 36; Plaintiff's Statement, ¶¶ 16–16b, 17, 17a.)

Mayo now complains that Collier was unhelpful.   The transcript, however, demonstrates that Collier acted in good faith and in Mayo's best interest.  <u>See</u> Declaration of Jeffery Lavis, Docket No. 42-3, Exhibit A (Tier III Hearing transcript).   It further establishes that Collier or Lavis fulfilled or attempted to fulfill each of Mayo's requests: Collier requested Mayo's medical reports (Tier III Hearing Tr., at Bates 81, 106); Lavis notified Mayo that his drug tests were negative (Tier III Hearing Tr., at Bates 83); and Lavis denied Mayo's request for a copy of his D-Block pass as irrelevant (Tier III Hearing Tr., at Bates 83-84.)   Lavis also indicated that he knew from Collier's submission that Mayo wanted to call Kelly as a witness and wanted to know the identities of the visiting room officers and the pat-frisk officer.  (Tier III Hearing Tr., at Bates 82.)

Lavis also heard from several of Mayo's witnesses.  Lavis permitted Kelly to testify

at length.  Lavis also identified and located Boughkite to testify, on the basis that Boughkite may have been the pat-frisk officer that Mayo wanted to examine (which he was not).  (Tier III Hearing Tr., at Bates 111.)

Lavis denied, however, Mayo's request to have the visiting room officers (Burgio and Pilarsky) testify concerning whether Mayo entered the visitation area with eyeglasses and a belt.  This is because Lavis determined that whether Mayo had glasses and a belt was irrelevant to the proceedings before him.  (Tier III Hearing Tr., at Bates 88, 107, 108, 109.) For this same reason, Lavis found Mayo's complaints that Collier falsely told him that Kelly knew where his glasses and belt were to be immaterial.  (Tier III Hearing Tr., at Bates 80.)

Given this record, this Court finds that no reasonable jury could find that Collier failed to adequately assist Mayo with his Tier III hearing.  Collier either provided the information Mayo requested or Lavis's rulings barred Mayo access to the information or deemed it irrelevant.  Moreover, any discrepancy between Collier and Kelly concerning whether Kelly knew what happened to Mayo's eyeglasses and belt was immaterial, because Lavis ruled that issue to be irrelevant.  It therefore did not negatively affect the proceedings.  Thus, even assuming some failure on Collier's part, that failure was harmless.  See Pilgrim, 571 F.3d at 2016.  Collier is therefore entitled to summary judgment on Mayo's Fourteenth Amendment claim against him.

### 2.    Claim Against Lavis

Mayo claims that Lavis violated his Fourteenth Amendment rights by refusing his request to call certain witnesses, permitting false testimony, and failing to act impartially. The transcript of the proceedings, however, belies each of these points.

First, Lavis permitted relevant witnesses to testify at the Tier III hearing.  (Tier III

17

Hearing Tr., at Bates 92, 111.)   He also permitted Mayo a full and fair opportunity to examine those witnesses.  The only witnesses Mayo was not able to call were those whom Lavis deemed irrelevant, and Lavis fully explained the reasons for his findings on the record.   See, e.g., (Tier III Hearing Tr., at Bates 87–88, 92, 97, 99, 104, 106–109, 115–118.)  Indeed, the transcript reveals multiple exchanges between Lavis and Mayo wherein Lavis permits Mayo a full opportunity to question witnesses, comment on testimony, and explain his objections. (Id.)  The transcript further reflects Lavis providing Mayo with explanations for his rulings and even clarifying his rulings when Mayo did not fully understand them. (Id.)  These actions were well within Lavis's discretion. See Kingsley v. Bureau of Prisons, 937 F.2d 2, 30 (2d Cir. 1991) (noting a hearing officer's authority to bar witnesses "on the basis of irrelevance or lack of necessity"); Eleby v. Selsky, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (citing Russell v. Selsky, 35 F.3d 55, 55-59 (2d Cir. 1994) ("Prison hearing officers . . . have the discretion to keep hearings within reasonable limits, and included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative.")).

Second, Mayo's claim that Lavis relied on false testimony is really a challenge to the sufficiency of the evidence underlying Lavis's decision and his crediting of certain testimony.   Review of the transcript, however, makes clear that Lavis's decision is supported by reliable evidence.  Both Kelly and Boughkite testified that Mayo reached for Kelly's baton and struck Kelly in the face.  (Tier III Hearing Tr., at Bates 101, 111.)  Lavis credited this testimony over Mayo's defense, which was essentially that Mayo had no reason to attack Kelly.  (Tier III Hearing Tr., at Bates 116.)  Lavis stated his decision on the

18

record and provided Mayo with a written copy of the disposition. (Tier III Hearing Tr., at Bates 117–118.) This is sufficient to meet the evidentiary requirements to sustain Lavis's determination.

Finally, there is no evidence in the record from which a reasonable trier of fact could conclude that Lavis failed to act in a neutral, impartial manner. It is well settled that inmates subject to disciplinary proceedings are entitled to an impartial hearing officer. See Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996). That is, a hearing officer who does not "prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." Patterson v. Coughlin, 905 F.2d 564, 569–70 (2d Cir. 1990). And "it is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen, 100 F.3d at 259.

Mayo maintains that Lavis was not impartial simply because he himself is a corrections officer. This, in and of itself, fails to establish impartiality under the Fourteenth Amendment. See Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process.").

As the transcript reveals, Lavis provided Mayo a full and fair hearing. Lavis ensured that Mayo received and understood the Misbehavior Report. He confirmed that Mayo had prison-provided assistance that he was satisfied with. He allowed Mayo to introduce evidence, call witnesses, question witnesses, comment on testimony, and fully state objections. Lavis further explained his rulings to Mayo, explained his decision, and provided him with a written copy of the disposition. The transcript is replete with instances

19

of Lavis assisting Mayo in locating witnesses, presenting questions, and understanding the proceedings.  There is no indication whatsoever that Lavis acted in anything other than a neutral, impartial manner.  In all, no reasonable jury could find that Mayo received anything short of the full process due under the Fourteenth Amendment.  Lavis is therefore entitled to summary judgment in his favor.

## F.    Qualified Immunity

Defendants argue that, even assuming Mayo suffered constitutional deprivations, they are entitled to qualified immunity.  Officials are protected from § 1983 liability on the basis of qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate the law. See Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999).

As discussed above, this Court concludes that no reasonable jury could find that Defendants' actions violated clearly established law or that their treatment of Mayo was unreasonable in any respect.  Moreover, it is objectively reasonable to conclude that Defendants' believed that their own actions were reasonable.  Accordingly, this Court finds that even assuming the existence of a constitutional violation, Defendants are entitled to qualified immunity.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  No reasonable trier of fact could conclude, based on the evidence of record, that Defendants violated Mayo's Eighth or Fourteenth Amendment rights.  Summary judgment in Defendants' favor is therefore warranted.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket

No. 42) is GRANTED.

FURTHER, that Plaintiff's Motion to Appoint Counsel (Docket No. 57) is DENIED

as moot.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:      May 12, 2016
            Buffalo, New York


                                        /s/William M. Skretny
                                        WILLIAM M.  SKRETNY
                                        United States District Judge